EDWIN A. LOMBARD, Judge.
|tThe defendant, Corey Robinson, appeals his conviction for armed robbery, a violation of La. Rev.Stat. 14:64.3, arguing that the trial court should have granted his motion to suppress the identification because the “show-up” identification procedure was suggestive. After review of the record in light of the applicable law and arguments of the parties, we affirm.

Relevant Facts and Procedural History

In the early morning hours of July 30, 2006, Daniel Chaplain, was carjacked at gunpoint when he stopped at a red light at South Robertson and Poland Avenue. He immediately called 911, his description of the vehicle was quickly disseminated by radio, and within minutes Officer Nathaniel Thomas Joseph of the New Orleans Police Department (NOPD) attempted to pull the vehicle over after spotting it in the vicinity of St. Claude and Franklin. The perpetrators failed to comply and a chase ensued, ending quickly when the vehicle crashed into a corner store at 2622 St. Claude Avenue. The two occupants of the truck jumped out and ran through the backyards, jumping fences, of Port Street and St. Claude Avenue. Officer Joseph’s pursuit was unsuccessful and he returned to the corner of Port Street and St. Claude Avenue.
12Based on the description, however, several National Guardsmen (patrolling the streets in post-Katrina New Orleans) apprehended the defendant near Clouet and North Villere Streets and brought him to Port Street and St. Claude Avenue where both the victim and Officer Joseph identified him.
On August 30, 2006, the defendant was charged by bill of information with one count of armed robbery and, at his arraignment on November 20, 2006, he pleaded not guilty. The defendant filed motions for a preliminary hearing and to suppress the identification but, after a hearing on August 26, 2008, at which Mr. Chaplain and Officer Joseph testified, the trial court found probable cause and denied the motion to suppress. At the end of a two day trial, a jury found the defendant guilty as charged on March 12, 2009. On March 30, 2009, the trial court sentenced the defendant to ten years at hard labor without the benefit of probation, parole or suspension of sentence, to be served consecutively with any other sentences.
In his sole assignment of error on appeal, the defendant argues that the trial court erred in denying his motion to suppress the identification.

Applicable Law

The trial court’s determination of the admissibility of identification evidence is entitled to great weight and will not be disturbed in the absence of an abuse of discretion. State v. Stovall, 2007-0343, p. 17 (La.App. 4 Cir. 2/6/08), 977 So.2d 1074, 1085. Generally, one-on-one identifications, although not favored, are permissible when justified by the circumstances, particularly when the accused is apprehended within a short time after the occurrence and is returned to the crime scene. State v. Woodberry, 95-2402, p. 5 (La.App. 4 Cir. 12/27/96), 686 So.2d 984, 988.
|sThe defendant bears the burden of proof on a motion to suppress an out-of-court identification. State v. Thibo- *161 deaux, 98-1673, p. 20 (La.9/8/99), 750 So.2d 916, 932; La.Code Crim. Proc. art. 703(D). The defendant must first prove that the identification procedure was suggestive. Id. (citing State v. Prudholm, 446 So.2d 729, 738 (La.1984)). An identification procedure is suggestive if, during the procedure, the witness’ attention is unduly focused on the defendant. Thibodeaux, 98-1673, at p. 21, 750 So.2d at 932 (citing State v. Robinson, 386 So.2d 1374, 1377 (La.1980)). In addition to suggestiveness, a defendant must prove that there was a substantial likelihood of mis-identification as a result of the identification procedure. Id. (citing Prudholm, 446 So.2d at 738). Even if an identification procedure is suggestive, the identification may be admissible if there does not exist a “very substantial likelihood of irreparable misidentification.” Id. (quoting Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). In order to determine whether the identification presents a substantial likelihood of misidentification, courts must look at the totality of circumstances, and consider the following factors: (1) the victim’s opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the victim during the commission of the crime; (3) the accuracy of any prior description; (4) the level of the victim’s certainty displayed at the time of the identification; and (5) the length of time elapsed between the crime and the identification. Manson v. Braithwaite, 432 U.S. at 116, 97 S.Ct. 2243.

Discussion

The following evidence was adduced at the motion hearing.
Detective Nathaniel Thomas Joseph testified that after receiving the description of the perpetrator of a carjacking that occurred at the corner of N. |4 Claiborne and Poland Avenues at approximately 3:50 a.m. on July 30, 2006 (a black male with a black handgun wearing a white t-shirt and short blue jeans driving a grey four door Sierra pickup truck with tinted windows and a purple hitchlight), he saw the vehicle in the area of St. Claude and Franklin Avenues, minutes away from where the carjacking occurred. He broadcast that he had found the vehicle and attempted to pull it over. The driver did not comply. A chase ensued, but the vehicle ran into a corner store at 2622 St. Claude Avenue, half a block away. The two occupants in the vehicle ran away, in the area of Port Street and St. Claude Avenue, jumping the fences of back yards. Officer Joseph chased, focusing on the driver, but was unable to keep up. He also called for backup, which was slowed down by a passing train. Officer Joseph returned to the corner of Port Street and St. Claude Avenue. The victim was taken to the same location, but Officer Joseph did not speak to him.
After the defendant was apprehended by several National Guardsmen near Clouet and N. Villere Streets because he fit “the description,” Officer Joseph _ received a call from the National Guard, describing the detainee as black, with dreadlocks, a white t-shirt, jeans shorts, and bleeding. Officer Joseph identified the apprehended individual (the defendant) as the driver who escaped from the vehicle. He was dirty, sweaty, and bleeding with a laceration, “maybe in his forearm,” for which he received stitches at the hospital. Officer Joseph opined that the laceration may have been a result of jumping fences during the escape.
Officer Joseph also participated in the show-up identification of the defendant by the victim. According to Officer Joseph, when the victim identified the defendant, the defendant was handcuffed and bleed *162 ing, a light was shone on him, and he (Officer Joseph) and other police officers were near the defendant. |sOfficer Joseph heard the victim positively identify the defendant as the person who placed a gun on him and stole his vehicle. Because he was a juvenile at the time, the defendant was not questioned at the scene. Officer Joseph identified the defendant in court.
On cross-examination, Officer Joseph could not recall if the street lights in the area behind St. Claude were working at the time. However, he recalled that there was enough light to see the driver exit the vehicle.
The victim, Mr. Chaplain, testified that at approximately 3:50 a.m. on July 30, 1006, he was driving to meet a friend in St. Bernard Parish to go fishing, His windows were down and he stopped at a red light at South Robertson and Poland Avenue. As he waited, someone approached, put a gun to his head, and demanded, “Put it in park. Don’t say a word. Get out. I’m gonna blow your f_ing head off.” Another “guy” was standing on the other side of the vehicle. When Mr. Chaplin got out, the assailant demanded that he run but, because he was unable to run, he walked over to the curb. The two assailants got in the truck and drove away.
Mr. Chaplain testified that when he exited his vehicle, he was able to clearly see the face of his assailant. Although the area was dark, there was a street light on at the corner, his truck had a light that came on when he opened the door, and the truck’s headlights were on. Mr. Chaplin stated, “I have lights all around, it was a new truck.”
Mr. Chaplain called 911 and described his truck as a silver 2002 Sierra GMC, with a Harley Davidson gas cap and “a lot of chrome.” Shortly thereafter, a policeman arrived and informed him that his vehicle had already been recovered. The policeman also informed him that one of the two assailants had been captured, while the other one got away. Mr. Chaplain was taken to the location where his |fitruck had crashed into the building. He was advised that the suspect that had been captured and would be presented on the neutral ground for him to identify. He was driven over in a police car, and there were approximately twenty police officers and many National Guardsmen present. A light was “put on” the captured individual, and Mr. Chaplain recognized him as his assailant, stating, “That’s definitely him. That’s the one who had the gun to my head.” According to Mr. Chaplain, the lighting during the identification was good because the defendant was illuminated by police lights shone directly on him. Mr. Chaplain estimated that the identification occurred some twenty to twenty-five minutes after the robbery.
On cross-examination, Mr. Chaplain conceded that he was “very shaken up” from the robbery, that he takes “nerve pills” and gets “pretty doggone scared” now when he goes to “the city.” He insisted, however, that the crime scene was well lit, noting that in addition to the stop lights, there was light by a post office. Moreover, according to Mr. Chaplain, when he pulled up to the intersection, he saw the defendant sitting on the porch of a house to the left of him. Mr. Chaplain turned, and when he turned back, the defendant was gone and, “Next thing I know, I had a gun on my head.”
Mr. Chaplain conceded that when he called 911, he told the operator that he was at the corner of St. Claude and Poland although he was actually at North Robertson and Poland. He explained that he was nervous at the time, that he also began giving the operator his home phone number before correcting himself and giving *163 his cell number, and that he also had trouble recalling the model of his truck.
| ^Although the perpetrator was wearing a white shirt and blue pants at the time of the robbery, the defendant was shirtless at the time Mr. Chaplain identified him at the crash scene. According to Mr. Chaplain, he knew, “they pulled it off’ because the defendant had cut his arm. When asked by the court what he recognized about Robinson at the show up identification, Mr. Chaplain explained:
Well, his face. I mean he was shaking like this and he was looking dead at me. And he put the gun to my head. And he was from her to — I mean he was so close, he was closer than that. I know his eyes and his face.
The following evidence was adduced at trial. Officer Melvin Labeaud testified that he responded to a carjacking call at the intersection of Poland Avenue and North Robertson Street at approximately 3:52 a.m. on July 30, 2006. When he arrived at the scene, he met the victim, Mr. Chaplain, who provided a description of his assailant. As Officer Lebeaud was interviewing Mr. Chaplain, Officer Joseph saw and began pursuing Mr. Chaplain’s vehicle. Officer Lebeaud informed Mr. Chaplain that his vehicle may have been recovered and that the perpetrator may have been apprehended. Officer Lebeaud then took Mr. Chaplain to the location where his vehicle had been recovered and Mr. Chaplain identified the perpetrator at that time. According to Officer Lebeaud, Mr. Chaplain described the perpetrator as twenty-one to twenty-two years old, weighing approximately 140 pounds and being five feet and three inches tall.
Officer Joseph testified, reiterating his hearing testimony and adding that after receiving the call about the carjacking he saw the described vehicle in the area of St. Claude and Franklin Avenues and pursued it. The chase lasted less than a block before the perpetrators crashed the truck into a grocery store at Port Street and St. Claude Avenue. As they got out of the vehicle, Officer Joseph focused on |sthe driver, chasing him. He saw his face, his clothing, his hair, “everything about him.” The scene was illuminated by Officer Joseph’s car lights. As the driver fled, he escaped into “like a backyard area with several fences.” Officer Joseph saw him hit a fence and believed he cut his arm on that fence. Officer Joseph recalled hearing the driver yell, “Ouch!” before he got away.
During the chase, Officer Joseph called for backup over the radio, but help was deterred by a passing train. Officer Joseph learned that someone had been detained and went to the corner of Clouet and Villere Streets where he immediately recognized the detainee as the driver of the stolen vehicle, the defendant. Officer Joseph then took the defendant back to the crashed vehicle. Mr. Chaplain was taken to the same location by Officer La-beaud. The defendant was placed on the neutral ground and Mr. Chaplain identified him from Officer Lebaud’s vehicle. The defendant was sweaty and dirty at this point. His right forearm was bleeding, for which he received treatment. A light was shone on him.
Pictures of the crashed truck showed the keys in the ignition, which is consistent with a carjacking. When the defendant was apprehended, no weapon was found on him. No weapon was ever recovered.
Officer Herman Franklin testified at trial that when he arrived at the crime scene at Poland and North Caiborne Avenues on July 30, 2006, Officer Lebeaud was interviewing Mr. Chaplain. He then received the call that Officer Joseph was pursuing the stolen vehicle and left the crime scene and proceeded toward the chase. The *164 truck crashed into the store while Officer Franklin was en route. When he arrived at Port Street and St. Claude Avenue, Officer Joseph was chasing the suspects. Officer Franklin remained with the truck and Mr. Chaplain and the defendant were subsequently brought to the crash scene. Based upon Mr, | ^Chaplain’s assertion that he could identify the carjacker and after consultation with Officer Joseph, Officer Franklin placed Mr. Chaplain inside his vehicle and told him that “the subject” would be placed on the neutral ground, some fifteen or twenty feet away, and a spotlight from a police car would be shown on the individual. The defendant was then removed from Officer Joseph’s car and taken to the neutral ground. Officer Franklin advised Mr. Chaplain that, “he would be coming out and we would have the spotlight on him, just take his time and look at him.” Mr. Chaplain identified the subject has the carjacker. Officer Franklin asked Mr. Chaplain if he was certain and his response was affirmative. Officer Franklin testified that the defendant was dirty, sweaty, and handcuffed during this procedure. After Mr. Chaplain positively identified him, the defendant was placed back in the police ear.
Mr. Chaplain also testified at trial, stating that when he stopped at a red light at the corner of N. Robertson and Poland Avenue at approximately 3:50 a.m. on July 30, 2006, he was going to meet his friend, Troy, to go fishing. As he stopped, he noticed a black man sitting on a porch across the street. He focused his attention on his cell phone, trying to call Troy and when he looked back up, the man was gone from the porch and standing by Mr. Chaplain’s truck, demanding that he put the vehicle into park and exit. The assailant was holding a firearm and was “shaking real bad.” He demanded that Mr. Chaplain exit the vehicle and go away. At the point, Mr. Chaplin noticed another man at the passenger side of his truck. Mr. Chaplin exited and walked to a nearby curb. He was afraid of being shot.
The truck drove off, turning right onto Poland Avenue, toward North Rampart or St. Claude Avenue. Mr. Chaplain crossed the street to a post office, |inwhere it was well lit, and called 911. He was so nervous that he initially gave the 911 operator a number that he had before Katrina. However, he corrected himself. Mr. Chaplain also erred in identifying the year of his vehicle. The police responded to the scene quickly — before the 911 call ended. Upon arrival, the officer informed Mr. Chaplain that his truck had been crashed, the two occupants had fled, and one of them had been caught. Mr. Chaplain stated, “I was just happy that, you know, that they caught — well, they said they caught one guy, not two people.”
According to Mr. Chaplain, he called his friend, Troy, who picked him up and took him to the crash scene on St. Claude Avenue. Once there, Mr. Chaplain waited twenty to twenty five minutes before a police officer asked if he thought he could identify the person who stole his track. Mr. Chaplain affirmed that, “I’ll never forget his face.” The officer informed him that one of the assailants had been captured and took Mr. Chaplain to him, approximately a block away. Mr. Chaplain got into a police car to go the block to the lighted area on the neutral ground where the defendant was standing surrounded by police cars and National Guardsmen. As Mr. Chaplain was driven up near the defendant, he assured the police officer driving the police car that the defendant was “definitely him.” Sitting in the front seat of the police car, Mr. Chaplain told the police officer “That’s the guy who stuck the gun up to my head.” When asked if he was sure of the identification, Mr. Chaplin responded, “Definitely.” Mr. *165 Chaplain remained seated in the police car during the entire onsite identification procedure.
Mr. Chaplain positively identified the defendant as his assailant in court, although the defendant no longer had the dreadlocks that he had at the time of the carjacking. Likewise, Mr. Chaplain conceded that the defendant was shirtless when he identified him at the show-up identification, although he described the Inperpetrator as wearing a white t-shirt at the time of the carjacking. Mr. Chaplain did not know what happened to the t-shirt between the time of the carjacking and the show-up identification, but asserted that had the defendant not been his assailant, he would not have identified him as such.
Nicole Heiser, an investigator for the Orleans Public Defender’s Office, testified that during her investigation of this case, she learned that Mr. Chaplain was seeking compensation for damages to his vehicle and for lost work and therefore willing to accept monetary compensation in exchange for not testifying. No such compensation was ever given, however.
Percy Robinson, the defendant’s nineteen-year-old brother, testified that their mother died during Hurricane Katrina, that their father lives in Texas, and since their return to New Orleans in the summer of 2006 the brothers lived with an aunt in the Ninth Ward on Alvar Street. According to Mr. Robinson, his brother received the laceration on his arm during a scuffle with a cousin that occurred shortly before 3:50 a.m. on July 30, 2006.

Analysis

In this case, the defendant was placed, handcuffed and bleeding and surrounded by police and National Guardsmen, in the middle of a neutral ground for the victim to identify. Moreover, shortly before the identification, one of the officers told Mr. Chaplain that the police had apprehended one of the men who robbed him. Under these circumstances, the show up identification was clearly suggestive.
However, a review of the totality of the circumstances in this case does not indicate that there is a substantial likelihood of misidentification. The defendant was apprehended almost immediately. The police arrived at the crime scene at 112Poland and North Robertson before Mr. Chaplain finished speaking to the 911 operator and informed Mr. Chaplain that his truck had been crashed and the driver caught. Mr. Chaplin went to the crash scene on St. Claude Avenue and identified the defendant within twenty to twenty-five minutes after the robbery. See State Ex. Rel. J.N., 2007-1229, 2007-1306 (La.App. 4 Cir. 5/7/08) 984 So.2d 910, (affirming trial court’s admission of a show up identification that occurred within an hour of the commission of the crime). Moreover, Mr. Chaplain was certain of his identification of the defendant as the man who pointed a gun at him. He explained at the hearing that he knew the defendant’s eyes and his face because the defendant had looked “dead at [him]” during the robbery.
Mr. Chaplain’s description of his assailant was consistent throughout the proceedings. At the hearing, he testified that the defendant wore a white shirt and blue pants at the time of the robbery, but that the shirt was gone at the identification. Mr. Chaplain opined that the shirt had been removed due to the defendant’s arm injury. This description is consistent with the description Officer Joseph received from the National Guardsmen when they apprehended the defendant — dreadlocks, white t-shirt, and jeans shorts. At trial, Mr. Chaplain testified that the defendant had dreadlocks and was wearing a white t-shirt at the time of the robbery and again *166 noted that the defendant’s shirt was removed prior to the show up identification.
Mr. Chaplain’s attention was clearly focused on the defendant’s face during the armed robbery. At the hearing, he told the trial judge that the defendant’s face “was so close” to him that he knew “his eyes and his face.” Mr. Chaplain also noted that Robinson was shaking, apparently from fear, and he looked “dead at” him. Mr. Chaplain’s certainty that Robinson was the person who robbed him of 113his truck and his entire testimony of how the robbery occurred, including Robinson’s close proximity to him during the incident, clearly shows Mr. Chaplain’s attention was focused only on the person with a gun to his head during the commission of the crime.
The defendant argues that Mr. Chaplain initially described him as twenty-one or twenty-two years old and 5'3", whereas he was actually sixteen years old and 5'7" at the time of the incident, but this slight discrepancy does not overcome Mr. Chaplain’s certainty of recognizing his face and eyes.
The defendant also argues that it was dark when the crime was committed, thereby hindering Mr. Chaplain’s opportunity to view him during the commission of the crime. However, Mr. Chaplain insisted at the hearing that the crime scene was sufficiently illuminated because there was a streetlight at the corner where the armed robbery occurred, his truck interior light came on when the door opened, and the truck headlights were on. According to Mr. Chaplain, “I have lights all around, it was a new truck.” There was also a lighted post office parking lot across the street. Under these circumstances, it is clear that, despite the lack of general lighting in the Ninth Ward in summer 2006, there was sufficient lighting in the immediate area of the crime scene for Mr. Chaplain to get a good look at the defendant in close proximity during the commission of the armed robbery.

Errors Patent

A review of the record reveals no errors patent.

Conclusion

After review of the record in light of factors enumerated by the U.S. Supreme Court in Manson, we do not find that there was a substantial likelihood of mis-identification and, accordingly, the trial judge did not abuse her vast discretion |14in denying the defendant’s motion to suppress the identification. The defendant’s conviction and sentence are affirmed.
AFFIRMED.